UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TZVEE ROTBERG, *individually and on
behalf of all others similarly situated*,
                                    Plaintiff,

                    -v-

JOS. A. BANK CLOTHIERS, INC., *et
al.*,
                                    Defendants.

16-CV-2962 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Tzvee Rotberg brings this action on behalf of a putative class of individuals who

he alleges have received certain text messages from Defendants Jos. A. Bank Clothiers, Inc.

("JAB") and Vibes Media, LLC ("Vibes") in violation of the Telephone Consumer Protection

Act ("TCPA"), 47 U.S.C. § 227 *et seq.* (Dkt. No. 13 ("FAC") ¶ 1.) Before the Court are

Defendants' motions to dismiss Rotberg's allegations for lack of standing pursuant to Federal

Rule of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to Federal Rule of Civil

Procedure 12(b)(6). (Dkt. Nos. 37, 39.) For the reasons that follow, Defendants' motions are

denied under Rule 12(b)(1), but granted under Rule 12(b)(6).

I.      **Background**

        A.      **The Telephone Consumer Protection Act**

        Congress enacted the Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243,

105 Stat. 2395 (codified at 47 U.S.C. § 227), in response to "[v]oluminous consumer complaints

about abuses of telephone technology." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370–71

(2012). At issue in the present action is the Act's provision prohibiting any "person within the

United States" from "mak[ing] any call (other than a call made . . . with the prior express consent

of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service."  47 U.S.C. § 227(b)(1)(A)(iii).  The statute provides a private right of action to any person contacted in violation of Section 227(b), and allows plaintiffs to recover statutory damages of up to $500 for each violation and up to $1500 for each knowing or willful violation.  *Id.* § 227(b)(3).  In enacting the TCPA, Congress directed the FCC to "prescribe regulations to implement the [Act's] requirements."  *Id*. § 227(b)(2).  Accordingly, the Court's analysis of the TCPA will be based in large part on the FCC's interpretations of the statutory language.

### B.    Factual Background

The following facts are drawn from the allegations in Rotberg's First Amended Complaint, which are presumed true for the purposes of these motions.

Plaintiff Tzvee Rotberg is an individual residing in the state of New York.  (FAC ¶ 8.) Defendants JAB and Vibes are business entities incorporated in Delaware with principal places of business in Maryland and Illinois, respectively.  (FAC ¶¶ 9–10.)  Acting as JAB's agent, Vibes sent Rotberg the text messages at issue in this case on JAB's behalf.  (FAC ¶ 11.)

Although Rotberg alleges that he received "several" text messages from Defendants (FAC ¶ 16), his TCPA claims are based on just two of those text messages (FAC ¶¶ 29, 31–32).

Rotberg describes the first of those text messages as the "initial marketing text message." (FAC ¶ 14.)  Rotberg's First Amended Complaint does not provide the specific date or content of the initial marketing text message, but it does provide some other details regarding that message.[1]  Rotberg alleges that the initial marketing text message was sent by Defendants to his

---

[1] In contrast, Rotberg's First Amendment Complaint provides the precise language of one of the subsequent text messages sent by Defendants to Plaintiff, a message which Plaintiff does not allege to have violated the TCPA.  That text message reads as follows:

cellphone sometime prior to February 25, 2016.  (*Id.*)  Rotberg avers that he had provided his

phone number to the Defendants prior to receiving that message, but he does not describe when

or how he did so other than to assert that in providing the number he did not consent to receiving

marketing text messages.  (FAC ¶ 23.)  Rotberg also alleges that the initial marketing text

message referred consumers to a webpage with a set of "Mobile Terms and Conditions" for

participation in JAB's mobile marketing program as administered by Vibes.  (FAC ¶ 23.)

Rotberg attaches a screenshot of these Mobile Terms and Conditions as an Exhibit to his First

Amended Complaint.  (Dkt. No. 13-1.)  Among the terms of participation required by that

document is the requirement that consumers consent "to receive autodialed messages, if any,

from Jos. A. Bank at the phone number from which [the consumer] send[s] the text."  (*Id.*)

The second text message on which Rotberg bases his TCPA claims is an opt-out

confirmation text that Defendants sent to Rotberg after he texted the word "stop" to Defendants'

phone number.  (FAC ¶¶ 25, 29.)  Again, Rotberg does not identify the precise date on which he

received this text, but he does allege that it was sent "[s]ometime following February 25, 2016."

(FAC ¶ 25.)  Furthermore, while Rotberg's First Amended Complaint also does not provide the

specific language of the opt-out confirmation text, it does represent that the opt-out confirmation

text included the URL "Vibes.com/help," and Rotberg attaches a screenshot of that webpage as

an Exhibit to his First Amended Complaint.  (FAC ¶ 25; Dkt. No. 13-2.)  That webpage consists

of a blank form under the header "Consumer Text Messaging Help Desk," allowing users to

submit requests for help with issues they experience with Vibes's text messaging program.  (Dkt.

---

JAB: Stock Up – BOG2 FREE Suits & Sportcoats+BOGO FREE Huge
Selection! Shop Online http://vbs.com/50iwjh or in-store. Ends 2/28 Excls
Apply HELP4help, STOP2quit

(FAC ¶ 15.)

No. 13-2.)  Rotberg alleges that the linked-to form constitutes marketing material because the top and bottom of the webpage contain links with titles such as "Meet Vibes," "News," "Events," and "Our Platform," each of which in turn leads consumers to webpages that promote Vibes's services.  (FAC ¶ 26.)  Rotberg also attaches screenshots of each of these linked-to webpages as Exhibits to his First Amended Complaint.  (*Id.*; Dkt. Nos. 13-3 through 13-12.)

Rotberg alleges that Defendants' text messages were sent using an automatic telephone dialing system ("ATDS" or "autodialer").  (FAC ¶ 18.)  He describes Defendants' autodialer as having "the capacity to store or produce telephone numbers to be called, using a random or sequential number generator" (FAC ¶ 19), an allegation that reproduces verbatim the statutory definition of the term.  *See* 47 U.S.C. § 227(a)(1).  Rotberg also alleges that Defendants' autodialer is able to "send text messages to a cellular telephone number from a list of telephone numbers automatically and without human intervention."  (FAC ¶ 20.)

Rotberg seeks to represent a class of all individuals who also received an initial marketing text message or an opt-out confirmation text message from Defendants within four years of the date of Rotberg's filing of his Complaint.  (FAC ¶¶ 29–32.)  With respect to injury, Rotberg alleges that he "and members of the Class . . . were harmed by the acts of Defendants" because the illegal text messages caused him "and the Class members to incur certain cellular telephone charges or reduce cellular telephone time for which Plaintiff and the Class members previously paid, and invad[ed] the privacy of said Plaintiff and the Class members."  (FAC ¶ 34.)  The First Amended Complaint seeks $500 in statutory damages for each of Defendants' negligent violations of the TCPA (FAC ¶¶ 44–45), and $1500 in statutory damages for each of Defendants' knowing and/or willful violations of the TCPA (FAC ¶¶ 48–49).

## C. Procedural Background

Rotberg commenced this action by filing an Initial Complaint against JAB on April 21, 2016. (Dkt. No. 1.) The Initial Complaint alleged that all of JAB's text messages to Rotberg were unsolicited and unconsented to (Dkt. No. 1 ¶¶ 10–12, 17–18), and it sought class certification and damages in connection with every text message sent by JAB to Rotberg (Dkt. No. 1 ¶¶ 23, 25, 37–38, 41–42). The Initial Complaint did not describe or specifically reference the initial marketing and opt-out confirmation text messages.

Prior to JAB's having answered or otherwise responded to the Initial Complaint, Rotberg filed a First Amended Complaint on June 15, 2016, which named both JAB and Vibes as Defendants. (Dkt. No. 13.) Defendants then filed separate motions to dismiss the First Amended Complaint on August 30, 2016, moving to dismiss under both Rule 12(b)(1) and Rule 12(b)(6). (Dkt. Nos. 37, 39.) In its motion, Defendant JAB asked the Court to take notice of the specific content of the initial marketing and opt-out confirmation text messages at issue, as represented in a settlement letter JAB had sent to Rotberg's counsel prior to the filing of the First Amended Complaint. (Dkt. No. 40 at 8 n.2; Dkt. No. 41). Additionally, Defendant Vibes moved the Court to stay Rotberg's action pending the outcome of a challenge to the Federal Communications Commission's interpretations of the statutory term "automatic telephone dialing system," which was before the D.C. Circuit. (Dkt. No. 38 at 19–22.)

On December 15, 2016, the Court granted Vibes' request for a stay pending the outcome of the D.C. Circuit's review of the term "autodialer." (Dkt. No. 54.) After the D.C. Circuit issued its opinion in March 2018, *see ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018), the Court granted the parties' joint motion to lift the stay and invited the parties to submit supplemental briefing addressing the impact of *ACA International* on the Defendants' reinstated motions to dismiss (Dkt. No. 58). Supplemental briefing was concluded on June 1, 2018 (Dkt.

No. 66), although since that time the parties have continued to provide notices of supplemental or recent authority regarding the issues raised by Defendants' motions (Dkt. Nos. 67–76.)

## II.     Legal Standards

Courts consider motions to dismiss for want of Article III standing under the rubric of Federal Rule of Civil Procedure 12(b)(1). *All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006). Dismissal of an action under Rule 12(b)(1) is warranted whenever a district court "'lacks the statutory or constitutional power to adjudicate it,' such as when . . . the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 417 (2d. Cir. 2015) (quoting *Markova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). A plaintiff bears the burden of establishing its standing by a preponderance of the evidence. *See Markova*, 201 F.3d at 113. "In assessing the plaintiff's assertion of standing, '[courts] accept as true all material allegations of the complaint[ ] and . . . construe the complaint in favor of the complaining party.'" *Cortlandt St. Recovery*, 790 F.3d at 417 (quoting *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008)). But courts may also consider evidence outside of the pleadings in assessing a Rule 12(b)(1) motion. *Cortlandt St. Recovery*, 790 F.3d at 417; *Markova*, 201 F.3d at 113.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This burden requires a plaintiff to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While factual allegations in a complaint are to be credited as true for purposes of Rule 12(b)(6) motions, "the tenet that a court must accept as true all of the

allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## III.    Discussion

### A.    Motions to Dismiss under Rule 12(b)(1)

The Court turns first to Defendants' motions to dismiss Rotberg's claims for lack of standing. (Dkt. No. 38 at 11–16; Dkt. No. 40 at 15–21.)

The three essential requirements of Article III standing are: (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). An "injury in fact" must be concrete and particular, rather than conjectural or hypothetical. *Id.* at 1548. The fact that Congress has created a private right of action for a statutory violation is insufficient by itself to establish an injury in fact where that violation is "a bare procedural violation, divorced from any concrete harm." *Id.* at 1549. But as long as an injury is particular and concrete, "the injury-in-fact necessary for standing need not be large; an identifiable trifle will suffice." *In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, 725 F.3d 65, 105 (2d Cir. 2013) (brackets omitted) (quoting *LaFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002)).

All of the courts of appeals to have addressed standing challenges to TCPA claims have agreed that the injuries caused by automated telephone calls—including cost, waste of time, annoyance, and invasion of privacy—are concrete injuries sufficient to confer Article III standing. *See Mejia v. Time Warner Cable Inc.*, Nos. 15 Civ. 6445 & 15 Civ. 6518, 2017 WL 3278926, at *7 (S.D.N.Y. Aug. 1, 2017) (citing cases from the Second, Eighth, and Eleventh Circuits); *see also Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (holding that TCPA violations cause "a concrete injury in fact sufficient to confer Article III

standing" because "[u]nsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients").

Rotberg alleges that he suffered these same types of injuries upon receipt of Defendants' text messages. (FAC ¶ 34.) In doing so, he "demonstrates more than a bare violation and satisfies the concrete-injury requirement for standing." *Leyse v. Lifetime Entm't Servs., LLC*, 679 F. App'x 44, 47 (2d Cir. 2017) (rejecting a standing challenge to TCPA claim).

Defendants argue that a different outcome is warranted here because, as discussed below, Rotberg's allegations turn entirely on the content of webpages linked to by the texts at issue, rather than on Defendants' sending and Rotberg's receiving of the actual texts themselves. (Dkt. No. 38 at 12–16; Dkt. No. 40 at 16–21.) According to Defendants, because all of Rotberg's alleged injuries are traceable only to his receipt of the relevant text messages rather than to Defendants' alleged wrongful use of those texts to send marketing materials, he fails to establish that the injury he suffered is fairly traceable to the wrongful aspects of Defendants' conduct. (Dkt. No. 38 at 13–14; Dkt. No. 40 at 17.) Defendants maintain that their inclusion of alleged marketing material in the relevant text messages was thus a "bare procedural violation, divorced from any concrete harm" allegedly caused by their automated sending of text messages. *Spokeo*, 136 S. Ct. at 1549.

Defendants are correct in noting that one specific feature of the text messages necessary to establish their illegality (marketing content) does not align with the feature of those text messages that Rotberg has alleged caused his injury (their invasiveness). But Defendants' argument demonstrates only that when choosing what class of unwanted phone messages to regulate, Congress did not make the scope of civil liability coextensive with all unwanted phone messages. Instead, Congress identified and targeted a subset of those injurious-in-fact messages

that it found most troublesome and appropriately subject to civil liability. And that category of unwanted phone messages singled out by Congress, which had been identified by consumers as the most irksome, consisted of "[p]hone calls from people selling things" and "phone calls from a computer trying to sell something." H.R. Rep. No. 102-317, at 9 (1991). Congress's choice to create a civil right of action for only a limited subset of invasive phone calls does not alter the conclusion that Rotberg's alleged injuries here are concrete and are directly traceable to Defendants' challenged conduct, namely their sending of unwanted text messages.

In short, "Second Circuit authority indicates that the Plaintiff has standing in this case to pursue his [TCPA] claim, and the Court sees no basis to conclude otherwise. The Court thus turns to the merits of the dispute." *Zani v. Rite Aid Headquarters Corp.*, 246 F. Supp. 3d 835, 847 (S.D.N.Y. 2017) (rejecting standing challenge to TCPA claim where liability turned on the content of automated calls).

**B.     Motions to Dismiss under Rule 12(b)(6)**

"To make out a claim under the TCPA, [a plaintiff] must show that (1) [a defendant] called her on her cell phone; (2) using an automated telephone dialing system or pre-recorded voice; (3) without her consent." *King v. Time Warner Cable*, 113 F. Supp. 3d 718, 725 (S.D.N.Y. 2015), *rev'd on other grounds*, 894 F.3d 473 (2d Cir. 2018). The parties do not dispute that Defendants' alleged text messages to Rotberg constituted calls within the meaning of the TCPA. *See* In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14,014, 14,115 ¶ 165 (2003) (clarifying that the TCPA's ban on autodialer calls to cellphones "encompasses both voice calls and text calls"). But Defendants each move to dismiss Rotberg's First Amended Complaint for failure to plausibly allege the other two elements of his TCPA claim: that Defendants used an ATDS, and that they called him without his consent.

## 1. Request for Judicial Notice

As a threshold matter, the Court addresses Defendant JAB's request that the Court take notice of the specific content of the text messages Rotberg alleges he received from Defendants. (Dkt. No. 40 at 8 n.2.)  Although Rotberg's First Amended Complaint does not disclose the content of certain of the relevant text messages, JAB describes the content of those messages in a settlement letter, which was attached to a declaration accompanying JAB's motion.  (Dkt. No. 41.)  JAB's counsel sent the settlement letter to Rotberg's counsel subsequent to the filing of the Initial Complaint, and the letter purports to describe and reproduce in full the language contained in the relevant text messages.  (*Id.*)  JAB relies on the content of the messages in arguing that they did not contain marketing material, and asks the Court to do the same.  (Dkt. No 40 at 8 n.2, 8–12.)

In assessing a motion to dismiss under Rule 12(b)(6), a "district court is normally required to look only to the allegations on the face of the complaint." *Roth v. Jennings*, 489 F.3d 499, 509 (2d. Cir. 2007).  However, "[i]n certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under Rule 12(b)(6)." *Id.* Most frequently, district courts consider "[d]ocuments that are attached to the complaint or incorporated in it by reference" because such documents "are deemed part of the pleading." *Id.* In addition, the Second Circuit has carved out a narrow set of circumstances in which courts may consider a document outside the complaint "even if not attached or incorporated by reference." *Id.* This exception may apply to any document "upon which [the complaint] *solely* relies and which is *integral to the complaint*." *Id.* (alternations and emphasis in original) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)).

The Court acknowledges that Second Circuit precedent indicates that the Court *may* take notice of the content of the underlying text messages for purposes of Defendants' Rule 12(b)(6)

motions, because the underlying text messages are documents upon which Rotberg "solely relies and which [are] integral to [his] complaint." *Cortec Indus., Inc.*, 949 F.2d at 47. But courts in this Circuit have interpreted *Cortec* as merely providing district courts with the *discretion* to consider such documents when appropriate. *See, e.g.*, *Republic of Colom. v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 451 (E.D.N.Y. 2007) ("*Cortec* merely states that the district court 'could' have considered documents in ruling on a Rule 12(b)(6) motion.").

Here, the Court declines to consider the content of the text messages in the form provided by JAB. The specific document JAB attaches to its motion to dismiss is not a direct reproduction of the relevant text messages, but is instead a settlement letter drafted by JAB's own counsel. (Dkt. No. 41.) Importantly, the document is devoid of any verification or certification as to the accuracy of the content of the messages reproduced therein. Among the conditions required prior to a district court considers such external documents at the Rule 12(b)(6) stage is that "no serious question as to their authenticity can exist." *Roth*, 489 F.3d at 509 (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)). JAB's settlement letter fails to satisfy that condition.

Given the vagueness of Rotberg's allegations regarding some of the text messages at issue (*see, e.g.*, FAC ¶ 14), the Court cannot conclude with certainty that the letter JAB produces references the same texts upon which Rotberg bases his claims. "In any event, a ruling on a motion for dismissal pursuant to Rule 12(b)(6) is not an occasion for the court to make findings of fact." *Roth*, 489 F.3d at 509. Accordingly, the Court declines to consider the text messages in the form submitted by JAB. In doing so, the Court does not foreclose the possibility that it could rely on those text messages if submitted in a different form at a later stage of this case, for

example as part of a motion to dismiss any subsequent amended complaint—at least to the extent that Rotberg continues to integrate and rely on those text messages to support his TCPA claims.

With this threshold issue now resolved, the Court turns to the substance of Defendants' Rule 12(b)(6) motions to dismiss Rotberg's First Amended Complaint, which concern two elements of his TCPA claim: that Defendants used an ATDS, and that they called him without his consent.

### 2.     Automatic Telephone Dialing System

Defendant Vibes moves to dismiss Rotberg's allegations that Defendants sent him text messages using an "automatic telephone dialing system." (Dkt. No. 38 at 10–11; Dkt. No. 62 at 11–15.)[2]

The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). There is a long and winding history of FCC and judicial attempts to construe this statutory language, portions of which have "generated substantial questions over the years." *ACA Int'l*, 885 F.3d at 701. At the time Defendants initially filed their motions to dismiss, the D.C. Circuit was reviewing a direct challenge to the FCC's 2015 ruling on the meaning of the term "automatic telephone dialing system," and the Court stayed this action and Defendants' motions pending the outcome of that case. (Dkt. No. 54.)

---

[2] While the Court ultimately dismisses Rotberg's First Amended Complaint on other grounds, the Court reviews the sufficiency of his allegations regarding Defendants' use of an ATDS to ensure granting Plaintiff leave to amend would not be futile. *See Scottrade, Inc. v. BroCo Invs., Inc.*, 774 F. Supp. 2d 573, 577, 584 (S.D.N.Y. 2011) (denying leave to amend on grounds of futility).

Since that time, the legal landscape surrounding the term "automatic telephone dialing system" has become somewhat less muddled. After the D.C. Circuit invalidated much of the FCC's treatment of the term, *see ACA Int'l*, 885 F.3d at 700, 703, the Second Circuit independently reviewed the statutory language and issued an opinion clarifying the requirements that equipment must satisfy in order to be considered an autodialer. *King v. Time Warner Cable, Inc.*, 894 F.3d 473 (2d Cir. 2018). In *King*, the Second Circuit held that to qualify as an ATDS under the statute, "a device's current functions, absent any modifications to the device's hardware or software[,]" must satisfy the function requirements set out in 47 U.S.C. § 227(a)(1). *Id.* at 481. But the Second Circuit also held that TCPA liability would extend to calls made from such a device regardless of whether the device was using its autodialing functions at the time of the offending call. *Id.* at 482. In so holding, the Second Circuit acknowledged that "courts may need to investigate, on a case-by-case basis, how much is needed to activate a device's autodialing potential in order to determine whether it" can currently function as an autodialer. *Id.* at 481.

Rotberg's First Amended Complaint and the attached Exhibits render sufficiently plausible his allegations that Defendants called him using a device with the current capacity to function as an autodialer. First and foremost, Rotberg correctly highlights his allegation that Defendants sent him a set of terms and conditions in which they requested that Rotberg "agree to receive autodialed messages." (Dkt. No. 13-1; Dkt. No. 63 at 14.) Granted, Defendants' choice to solicit Rotberg's consent to send him autodialed messages does not definitively prove that they used a device capable of doing so, particularly in light of intervening clarification of the meaning of that term in the wake of *ACA International*. Still, the indication in the terms and

conditions that Defendants intended to employ an autodialer renders plausible Rotberg's allegation that their device was capable of functioning as one.

The First Amended Complaint also contains other allegations indicative of Defendants' use of an automated calling platform: for example the use of a short code telephone number (FAC ¶ 17), the sending of generic text messages (FAC ¶ 15), and Vibes's advertising materials suggesting that it had previously delivered more than four billion mobile messages (Dkt. No. 13-12). These indicators of automation and mass marketing contribute to the plausibility of Plaintiff's allegations regarding Defendants' use of an ATDS. *See Krady v. Eleven Salon Spa*, No. 16 Civ. 5999, 2017 WL 6541443, at *4 (E.D.N.Y. July 28, 2017), *report and recommendation adopted*, 2017 WL 6542462 (E.D.N.Y. Dec. 21, 2017) (holding that same type of circumstantial evidence gave rise to reasonable inference that autodialer was used). Far less specific allegations regarding a TCPA defendant's use of an autodialer have survived similar motions to dismiss. *See Unchageri v. YuppTV USA, Inc.*, No. 17 Civ. 3862, 2018 WL 1184737, at *3 (N.D. Ill. Mar. 7, 2018) (collecting cases).

Discovery may reveal that Defendants' calling systems in fact lacked certain of the capacities required to constitute an ATDS. But "while [Rotberg] has not *proved* that [Defendants] used an ATDS to send him the text messages, proof is not necessary at this stage, only plausibility, and the complaint together with its exhibits plausibly allege that [Defendants] did just that." *Id.* The Court thus denies Defendant Vibes' motion to dismiss Rotberg's First Amended Complaint for failure to plausibly allege that Defendants' sent the texts at issue using an autodialer.[3]

---

[3] Because the Court concludes that Plaintiff's allegations plausibly allege that Defendants employed a device capable of generating random numbers to be dialed, the Court need not at this stage resolve their dispute regarding whether the capacity to do so is an essential element of a

### 3.  Consent

Defendants also contend that Rotberg's TCPA claims should be dismissed because Rotberg consented to receiving the messages at issue.  (Dkt. No. 38 at 6–10, 17–19; Dkt. No. 40 at 7–12.)

Calls "made with the prior express consent of the called party" are not subject to TCPA liability.  47 U.S.C. § 227(b)(1)(A).  The statute does not define "prior express consent," but the FCC has promulgated regulations governing the level of consent a caller must obtain prior to calling a cellphone using an ATDS.  "[B]oth parties rely principally on [these] FCC rulings to support their respective positions," and the Court will do the same.  *Nigro v. Mercantile Adjustment Bureau, LLC*, 769 F.3d 804, 806 (2d Cir. 2014).

The FCC has established a two-tier system of consent, with the two tiers being "prior express consent" and "prior express *written* consent."  47 C.F.R. § 64.1200(a) (emphasis added).  The level of consent required for any given call turns on that call's content.  *Id.*

All calls other than those containing advertisements or constituting telemarketing require only "the prior express consent of the called party."  *Id.* § 64.1200(a)(1).  The FCC has explained that this lower threshold of consent can be satisfied by the simple act of giving one's phone number directly to a caller.  *See, e.g.*, In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 7 FCC Rcd. 8752, 8769 ¶ 31 (1992) ("[P]ersons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given[.]"); In re Rules and Regulations Implementing the

---

statutory autodialer.  (Dkt. No. 62 at 9–10;  Dkt. No. 63 at 7–19.)  The Second Circuit in *King* recognized this is a "complicated question[]" and expressly declined to answer it.  894 F.3d at 481.  Should discovery reveal that Defendants' device in fact lacked the capacity to generate random numbers to be dialed, Defendants may renew this argument at a subsequent stage of this case.

Telephone Consumer Protection Act of 1991, 30 FCC Rcd. 7961, 7991–92 ¶ 52 (2015) ("For non-telemarketing and non-advertising calls, express consent can be demonstrated by the called party giving prior express oral or written consent or, in the absence of instructions to the contrary, by giving his or her wireless number to the person initiating the autodialed or prerecorded call."(footnote omitted)).

In contrast, if a caller wishes to use an ATDS to make a "call that includes or introduces an advertisement or constitutes telemarketing," she must obtain "prior express *written* consent." 47 C.F.R. § 64.1200(a)(2) (emphasis added). The relevant regulations define this heightened level of consent required for telemarketing or advertising calls as follows:

> [A]n agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

*Id.* § 64.1200(f)(8). The regulations define "advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services," *id.* § 64.1200(f)(1), and "telemarketing" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person," *id.* § 64.1200(f)(12).

Rotberg's TCPA claims are based on two separate text messages that Defendants allegedly sent to him: (1) the initial marketing text message, and (2) the opt-out confirmation text message. (FAC ¶¶ 14, 25, 29.) Each is addressed in turn.

### a. The Initial Marketing Text Message

The Court first addresses Defendants' argument that Rotberg had consented to receive what Rotberg terms "the initial marketing text message."

Rotberg concedes that he had given his phone number to Defendants prior to receiving the initial marketing text message.  (FAC ¶ 23).  This allegation by itself appears sufficient to establish his prior express consent to receive non-telemarketing autodialed calls at that number.  "While there is a minority of courts that have found otherwise, the great weight of authority holds that an individual who knowingly provides her telephone number to another party without limiting instructions has giv[en] her prior express consent to receive calls at that number from that party."  *Daniel v. Five Stars Loyalty, Inc.*, No. 15 Civ. 3546, 2015 WL 7454260, at *6 (N.D. Cal. Nov. 24, 2015) (citing cases and relevant FCC orders); *see also Saunders v. NCO Fin. Sys., Inc.*, 910 F. Supp. 2d 464, 467 (E.D.N.Y. 2012) ("[T]he authorities are almost unanimous that voluntarily furnishing a cellphone number to a vendor . . . constitutes express consent.") (collecting cases).

Rotberg does not dispute this conclusion.  Instead, Rotberg argues that the initial text message Defendants sent to him constituted telemarketing, and that when he gave his phone number to Defendants he did not provide the express *written* consent the TCPA requires prior to sending such telemarketing messages.  (FAC ¶¶ 21–23; Dkt. No. 44 at 1–5; Dkt. No. 46 at 3–7.)  Accordingly, the viability of Rotberg's TCPA claim based on the initial marketing text message turns on whether Rotberg has plausibly alleged that that the initial text message constituted telemarketing.

Rotberg's primary description of the initial marketing text message is as follows: "Sometime prior to February 25, 2016, Defendants sent an initial marketing text message to Rotberg's cellular telephone."  (FAC ¶ 14.)  Rotberg asserts that Defendants "may [ ] not properly argue on the motion to dismiss that the initial text message was not a marketing text message, for Mr. Rotberg clearly alleges in the [First Amended Complaint] that it was."  (Dkt.

No. 46 at 4.)  Not so.  Rotberg's tautological description of the "initial marketing text message" as a text that contained marketing material is nothing more than a "formulaic recitation of [one of] the elements of [his] cause of action," which the Supreme Court instructs is insufficient to survive a Rule 12(b)(6) motion.  *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.")  Rotberg cannot simply parrot a legal requirement of his cause of action to sufficiently plead a claim for which relief can be granted.

Furthermore, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  Rotberg's conclusory allegation that the initial text message constituted telemarketing—a legally defined term and a required element of his TCPA claim—is precisely the kind of legal conclusion that courts must disregard.   Accordingly, in assessing the plausibility of Rotberg's allegation regarding the initial text message's "marketing" character, the Court disregards Rotberg's conclusory descriptions of that text.

Beyond Rotberg's generic references to the "initial telemarketing text message" (FAC ¶¶ 14, 21), Rotberg's only specific allegation regarding the content of that text message is that it referred recipients "to the webpage located at 'http://bit.ly/1htG0Tu,'" a webpage that Rotberg attaches as an exhibit to his First Amended Complaint.  (FAC ¶ 23.)  That webpage consists of the terms and conditions required for participation in Defendants' automated mobile marketing program.  (Dkt. No. 13-1.)[4]  But a caller seeking out a consumer's express written consent to

---

[4] Defendants cite case law suggesting that the Court should not even consider the content of this web page in assessing the telemarketing character of the initial text message.  *See Holt v. Redbox Automated Retail, LLC*, No. 11 Civ. 3046, 2013 WL 12114789, at *4 (S.D. Cal. June 20, 2013) ("The Court, however, declines to adopt this 'look through' approach to liability under the TCPA.  Rather, the Court looks to the texts themselves, . . . [not to] what a consumer would find

send *subsequent* telemarketing or advertising texts is not as a matter of law already engaged in telemarketing.  Courts addressing similar circumstances have held that once express consent to receive non-telemarketing texts is established, "a text sent solely for the purpose of allowing the recipient to complete a registration process . . . is not telemarketing within the meaning of 47 C.F.R. § 64.1200(f)(12)."  *Daniel*, 2015 WL 7454260, at *4; *see also Aderhold v. Car2go N.A., LLC*, No. 13 Civ. 489, 2014 WL 794802, at *9 (W.D. Wash. Feb. 27, 2014) ("[Plaintiff] argues that [ ] the text . . . was a telemarketing text.  The court has no difficult[y] concluding that he is mistaken.  There is no indication that the text was intended for anything other than . . . to permit [plaintiff] to complete registration.").  Here, Plaintiff received a straightforward contract setting forth the terms and conditions by which he could consent to receive marketing materials in subsequent messages, after he had given his prior express consent to be contacted by JAB.  The Court declines to construe the linked-to webpage as itself constituting marketing material.

Because Rotberg's First Amended Complaint fails to plead facts sufficient to support his assertion that the "initial marketing text message" constituted telemarketing or contained advertising materials such that Rotberg's express *written* consent was required, his TCPA claims based on that initial text message must be dismissed.  Given that Rotberg did not deem it necessary to include the full language of the initial text message in his First Amended Complaint despite referencing links provided by that initial text message and the precise wording of other texts (FAC ¶¶ 15, 23), it may well be that Rotberg simply cannot plausibly allege that the initial text message contained marketing material.  Nevertheless, the Court will grant Rotberg's request for leave to replead his allegations based on the "initial marketing text message" (Dkt. No. 44 at

---

if he or she pursued the link.")  The Court declines to address the persuasiveness of the *Holt* court's analysis because here, even considering the content of the linked-to webpage, Plaintiff's allegations are insufficient as a matter of law.

4), provided that he can do so in good faith in a manner consistent with this opinion.  *See Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) ("When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint.").

### b. The Opt-Out Confirmation Text

The second text message that Defendants allegedly sent in violation of the TCPA is the opt-out confirmation message.  (FAC ¶¶ 25, 29.)  Plaintiff alleges that he received this text after sending the word "stop" to Defendants' short code phone number.  (FAC ¶ 25.)  Plaintiff again does not provide the actual content of that text message.  Instead, he alleges that it illegally contained marketing material in the form of a link to a website that he attaches as an Exhibit to his First Amended Complaint.  (*Id.*; Dkt. No. 13-2.)

Both Plaintiff and Defendants rely principally on the FCC's declaratory ruling in response to a petition from SoundBite Communications, Inc. to assess whether this opt-out confirmation text violated the TCPA.  *See* In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 ("*SoundBite*"), 27 FCC Rcd. 15,391 (2012).  In that ruling, the FCC "conclude[d] that a consumer's prior express consent to receive text messages from an entity can be reasonably construed to include consent to receive a final, one-time text message confirming that such consent is being revoked at the request of that consumer."  *Id.* at 15,394 ¶ 7.  However, the FCC held that permissible opt-out confirmation texts would be "limited to texts that: 1) merely confirm the consumer's opt-out request and do not include any marketing or promotional information; and 2) are the only additional message sent to the consumer after receipt of the opt-out request."  *Id.* at 15,397 ¶ 11.

The FCC acknowledged that subsequent application of its *SoundBite* ruling would require some "review [of] questionable confirmation texts on a case-by-case basis."  *Id.* at 15,397 ¶ 12. The FCC provided the following guidance for conducting such a review:

On the one side, we believe that confirmation texts that include contact information or instructions as to how a consumer can opt back in fall reasonably within consumer consent. On the other, texts that clearly contain marketing or promotional materials (such as "your request to opt-out of future messages will be honored but we are offering you a 10% discount on our products") and texts that encourage consumers to call or otherwise contact the sender in an attempt to market, including such texts that, while neutral on their face, lead to a marketing message if the consumer contacts the sender, are likely beyond the scope of the consumer's prior consent.

*Id.*

Applying that guidance to the First Amended Complaint's description of Defendants' opt-out confirmation text, the Court has no trouble concluding that the text falls into the first category of permissible opt-out confirmations. The First Amended Complaint does not reproduce the language of the opt-out confirmation, but references only a URL contained within that text. (FAC ¶ 25.) Plaintiff alleges that the relevant URL, "Vibes.com/help," led to a webpage containing a blank form under the header "Consumer Text Messaging Help Desk," which invited users to submit requests for help with technical issues they experienced with Vibes's automatic text messaging program. (Dkt. No. 13-2.) This form by itself is clearly intended to do nothing more than provide consumers with a means of contacting Vibes for help, and thus is akin to providing "instructions as to how a consumer can opt back in," which "fall[s] reasonably within consumer consent." *SoundBite*, 277 FCC Rcd. at 15,397 ¶ 12.

Plaintiff disputes this characterization of the webpage located at Vibes.com/help. In doing so, he emphasizes that both the top and bottom of the help webpage contain links with titles such as "Meet Vibes," "News," "Events," and "Our Platform," each of which leads to webpages that provide information promoting Vibes's services. (FAC ¶¶ 25–26.) The Court is unpersuaded by Plaintiff's argument. As Vibes notes, it would be odd indeed for Vibes to employ an opt-out text message sent to an individual consumer of JAB's retail clothing as an

opportunity to advertise its mass marketing services geared toward "some of the world's biggest brands."  (Dkt. No. 13-12; *see also* Dkt. No. 38 at 19.)  Rather than evidencing Vibes's "attempt to market," the presence of these links on the help page merely indicates that Vibes chose to locate its help page on its own website, which is not inconsistent with reasoning of the *SoundBite* ruling, 277 FCC Rcd. at 15,397 ¶ 12.  Vibes's permissible decision to include "information or instructions" in an opt-out confirmation text did not become unlawful because those instructions were housed on a web platform that peripherally contained nondescript links to other portions of Vibes's website.  *See id.*  That those links might lead the curious consumer to marketing material located on another webpage does not indicate that the twice-removed underlying text message was intended to convey "marketing or promotional information" in violation of the FCC's guidelines for such text messages.  *See id.* at 15,397 ¶ 11.

This holding does not foreclose the possibility that the language of the underlying text message itself might have contained impermissible marketing material.  As it stands, because the First Amended Complaint is devoid of any reference to the specific content of the opt-out text other than the link to Vibes's help page, the Court cannot say that such a conclusion is *plausible* for purposes of Defendants' Rule 12(b)(6) motion to dismiss.  The First Amended Complaint's claims based on the opt-out confirmation text accordingly must be dismissed.  But the Court will grant Rotberg's request for leave to replead his allegations based on the opt-out confirmation text in a manner consistent with this opinion.  (Dkt. No. 44 at 4.)

## IV.    Conclusion

For the foregoing reasons, Defendants' motions to dismiss Plaintiff Rotberg's First Amended Complaint are GRANTED, and the First Amended Complaint is DISMISSED pursuant to Rule 12(b)(6).

Plaintiff is granted leave to replead by filing a Second Amended Complaint consistent with this opinion, provided that any such complaint must be filed within 21 days of the date of this opinion.

The Clerk of Court is directed to close the motions at Docket Numbers 37 and 39.

SO ORDERED.

Dated: November 5, 2018
       New York, New York

_____
J. PAUL OETKEN
United States District Judge